UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) Case: 2:17-CR-533-KOB-TMP |
| DOUGLAS GLOVER | ) |

**SENTENCING MEMORANDUM ON BEHALF OF DOUGLAS GLOVER**

Douglas Glover, through counsel, respectfully submits the following memorandum in advance of his April 4, 2019, sentencing hearing for his guilty plea to a single count of violating 18 U.S.C. § 554, the attempted exportation of firearms.

At the sentencing hearing, Mr. Glover will ask for a sentence of time served to be followed by 3 years of supervised release with special conditions of 6 months of home detention and drug testing. He is currently working, helping to care for his ailing father, and complying with all the terms of his pretrial release. Within the plea agreement, the parties agreed to an advisory guideline range of 10 — 16 months, which would fall within Zone C of the U.S. Sentencing Commission's sentencing table. As the Court is well aware, Zone C allows for split sentences, and Mr. Glover already has 5 months and 29 days jail credit due to his time in federal pretrial custody. Below Mr. Glover reviews the relevant 18 U.S.C. § 3553(a) factors and explains why the requested sentence is sufficient, but not greater than necessary under the unique facts and circumstances of this case.

1

I.  **The nature and circumstance of the offense, 18 U.S.C. § 3553(a)(1).**

This case arises from Mr. Glover seeking employment and placing his resume on Monster.com. He had not held a full time job in years, and he was eager to find work. A company called North Star Freight emailed Mr. Glover about a job, whereby he would receive packages to his home. The company said that it would email him new labels for the packages, and he would attach the new labels with his return address and take the packages to his local post office, Federal Express facility, or UPS store. He began receiving emails from a "Ginger M. Towers," who characterized herself as his "direct supervisor." These emails often stated that "I hope that I can count on you," and "I hope that you will manage with it" and justified the process as follows:

> All packages are usually addressed directly to our customers. So names on the packages will be always different. This is convenient for us because it becomes evident what package belongs to the current customer. You will be always notified beforehand about the upcoming packages and the names of our customers. So do not surprise [sic] and accept these packages. The shipments do not contain your name because the customer enters personal billing information but the shipping address belongs to the merchandise manager. So it is usual procedure, You should tell the postman that you are from the person whose name is on parcel and get the box.

As to his pay, Mr. Glover received a message from Ginger stating that "First salary you will receive via check, but next salary you can choose." Then, a week later, when he had not been paid, Mr. Glover received this message from Ginger:

> You is to serve a probationary period of 28 days. The start date of the probationary period shall be the date of sending by the Employee of the first package. At the end of the probationary period to you shall be paid wages at the rate of$ 25.00 for each parcel sent to them during the trial period. The wage is paid by the check or PayPal. After a probationary period the wage is paid to you each two weeks. Your first salary will be paid 12/23/2016.

2

While many may have questioned the authenticity of Ginger and this company, Mr. Glover did not. He received and mailed packages from November 23, 2016, to December 19, 2016. When the postal inspectors came to his home on December 9, 2016, he voluntarily spoke with them, explained the job he had received through Monster.com and he provided the inspectors with the emails he had received from "Ginger."

After speaking with the postal inspectors, Mr. Glover signed a form providing that he would no longer reship the packages. That same day, Mr. Glover emailed Ginger the following "Hi, I hate to inform u but i can not receive packages anymore. So i am quitting this position. Please stop shipment of any other packages." Again, later that day, Mr. Glover emailed Ginger "I can not send them nor pick them up, so … they will have to be returned to sender." Later that same day, Mr. Glover emailed the postal inspector to let her know that he quit the job and he provided the UPS tracking number of a package in transit to him and attached copies of the shipping labels he had in his possession.

Importantly, Mr. Glover asked the postal inspector for a time and place where he could give her the packages. In that email, Mr. Glover even offered to meet the postal inspector that day. The postal inspector wrote back on December 9, 2016, that she could arrange to get the packages on December 14, 2016. Mr. Glover responded within 2 hours that any time on December 14, 2016 worked for him, and he asked the postal inspector to let him know what time to meet on December 14, 2016.

But then the postal inspector allowed 6 days to pass before sending any response to Mr. Glover. The postal inspector did not respond until December 15, 2016. During this 6-day period, Ginger repeatedly emailed Mr. Glover with "Urgent" emails and convinced him that the postal inspector was a fraud. Ginger sent Mr. Glover emails that the domain name of the postal inspector's email address appeared to be fraudulent, that a postal inspector would not accept shipping labels over email, and that the postal inspector's telephone number could be a fake number using a voice-over IP address. Ginger specifically told Mr. Glover that the postal inspectors may be "fraudsters" who were trying to steal the packages he had been assigned by the company to reship. By December 14, 2016, Mr. Glover still has not heard from the postal inspector, and he wrote to Ginger that "Ok, the inspector said they would get back in touch me about the matter but they have not and they haven't responded to me."

On December 15, 2016, the postal inspector emailed Mr. Glover, stating that it could not pick up the packages and instructing him to take the packages to the Center Point Post Office. Mr. Glover responded that Ginger had told him the report made by the postal inspectors was false, that she had no record of the tracking number or person postal inspectors had referenced at the December 9th meeting, and therefore the agreement he had signed meant nothing. Mr. Glover, in his final email to the postal inspector, stated that he could not just do what the postal inspector said since he felt it was a conflict of interest. Mr. Glover told the postal inspectors that they needed to get in contact with his supervisor at "the company." Then, on December 16

4

and 19, 2016, Mr. Glover took the packages to the Center Point Post Office and placed them in the mail with the labels provided by Ginger. The packages were pulled by the postal service for counterfeit postage and found to contain automobile parts and Glock and magazines for AK-47 style rifles without ammunition. The attempted mailing of those magazines without the appropriate exportation documentation forms the basis of this offense.

Mr. Glover notes that the government's recitation of the nature and circumstances of the offense in its sentencing memorandum omits the following relevant facts:

- Mr. Glover voluntarily spoke with the postal inspectors about the packages and provided postal inspectors with the emails and the shipping labels he received from the company;

- Mr. Glover proactively informed postal inspectors that he had received other packages;

- Mr. Glover proactively offered to meet the postal inspectors and give them with the packages;

- The postal inspectors failed to respond to his email to set a time to receive the packages and allowed the day the postal inspectors set to pass without setting a time to transfer the packages;

- When the postal inspectors failed to respond, the company convinced Mr. Glover that the postal inspectors were fake;

- Mr. Glover quit the "job" and was not paid by the company;

- Mr. Glover has taken responsibility for his conduct and timely pleaded guilty.

II. **Mr. Glover's background and history, 18 U.S.C. § 3553(a)(1).**

Today Mr. Glover is 39 and doing well. He is working as a customer service representative and, since his release from pretrial custody, his pretrial probation

5

officer has reported that Mr. Glover has complied with all conditions of release, including reporting to the probation officer and submitting negative drug screens. (PSR ¶¶ 10, 76.) With the guilty plea to count three behind him, Mr. Glover is also better handling the stress of facing prosecution in this case and maintaining communication with his probation officer and counsel. As of the day of sentencing, Mr. Glover has already been under the supervision of the probation office for more than 8 months.

And, importantly, Mr. Glover is helping to care for his ailing father. When this case was first charged, Mr. Glover and his father lived together in a split-level home. While Mr. Glover was held in pretrial custody, his father developed Guillain-Barre syndrome and remained hospitalized for several months. (PSR ¶ 55.) When Mr. Glover was released from pretrial custody, he went back to the home they had shared in order to maintain it and started working. Since that time, his father has been released from long-term rehabilitation and placed with a family member with a single-story home. *Id*. Mr. Glover has continued to visit and care for his father, including coordinating with the Department of Veterans Affairs for construction of wheelchair access to their split-level home. Once that work is completed, Mr. Glover's father will move back into the split-level home with Mr. Glover serving as a care giver for his father.[1]

---

[1] Notably, the government's sentencing memorandum states that "[a]ccording to information contained in the PSR, in May and June of 2015, the Defendant made threats…." (Doc. 52 at 4.) This is a pending case with an allegation that Mr. Glover has denied. (PSR ¶ 52.) Mr. Glover notes that the PSR does not state a finding that Mr. Glover made threats; it recites a pending allegation against him by his ex-wife.

III. **The kinds of sentences available and the sentencing range, 18 U.S.C. § 3553(a)(3) and (4).**

Sentencing courts must also consider the various "kinds of sentences available," 18 U.S.C. § 3553(a)(3), and the applicable sentencing guideline range, 18 U.S.C. § 3553(a)(4). As to the "kinds of sentences available," the statutory sentencing range for the offense is from probation to 10 years in custody. 18 U.S.C. § 554. Title 18 U.S.C. § 3561(c) provides that this Court may impose a sentence between one and five years of probation per count while the maximum term of imprisonment is 5 years per count. (PSR ¶¶ 82, 89.)

As to the sentencing range, the U.S. Sentencing Guidelines relating to the statute charged in this case provides only two base offense levels – 26 or 14. *See* U.S.S.G. § 2M5.2. The stark difference covers a range of types of offenses and, as Mr. Glover has argued in his objection to the PSR, the conduct at issue here is more akin to the conduct proscribed with a base offense level of 14. Indeed, within the plea agreement, the government and Mr. Glover agreed to "stipulate that the Guideline imprisonment range is between 10 and 16 months." (Doc. 44 at 11.)

The range of 10 — 16 months results from a base offense level of 14 under U.S.S.G. § 2M5.2(a)(2)(B) and a total offense level of 12 with consideration of Mr. Glover's timely guilty plea and acceptance of responsibility. When combined with his criminal history score of zero, Mr. Glover would fall at 10 — 16 months, which falls within Zone C of the U.S. Sentencing Commission's Sentencing Table.

For an offense failing within this zone, the Sentencing Commission provides that the minimum term (here, 10 months) may be satisfied with "at least one-half"

7

satisfied by imprisonment (here, 5 months) and the remainder a term of supervised release that includes home detention or community confinement (here, 5 – 11 months). U.S.S.G. § 5C1.1(d). Mr. Glover has already served nearly 6 months in the custody of the U.S. Marshals and the Bureau of Prisons.

In its sentencing memorandum, the government asserts that the offense conduct would result in an advisory guideline range of 46 – 57 months, and it appears to argue that this range should be considered because the Sentencing Commission examines tens of thousands of cases. But a closer look at the statistics from the Sentencing Commission shows that in Fiscal Year 2017, the Sentencing Commission analyzed 67,368 cases and of those cases only 107 cases applied U.S.S.G. § 5M5.2 with even less in fiscal year 2016.[2] Thus, less than 2 percent of the cases fell within the guideline and, and of those cases, the statistics show that none received upward departures or variances and that only 33 defendants received sentences within the guideline range due to *downward* departures or variances.[3]

A review of cases available on Westlaw also shows that the requested sentence in reasonable in relation to other cases. In July 2018, the Eastern District of New York sentenced a defendant to two months of imprisonment to be followed by six months of supervised release in a similar case that fell within U.S.S.G. § 2M5.2(a)(1).

---

[2] The U.S. Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics Guidelines Calculation Based*, Fiscal Year 2017, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2017/Use_of_SOC_Guideline_Based.pdf.
[3] The U.S. Sentencing Commission, *Sourcebook, Fiscal Year 2017*, Table 28, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/2017SB_Full.pdf

*United States v. Smith*, 321 F. Supp. 3d 405, 406 (E.D.N.Y. 2018). Similar to Mr. Glover, the Eastern District of New York described the defendant as "naïve" for his conduct of being "convinced by a friend to pack in his luggage internal operating parts of a popular handgun, the Glock, fly to Turkey and sell them." *Id*. That defendant's guideline range was 51 – 63 months with the government requesting a guideline sentence, but the court found a sentence of only 2 months appropriate. *Id*. at 407. The *Smith* case and Mr. Glover's case stand in contrast to other recent cases like *United States v. Vasquez*, 745 F. App'x 321 (11th Cir. 2018) and *United States v. Zamor*, 746 F. App'x 960 (11th Cir. 2018), in which the defendants actively purchased weapons and ammunition for weapons smuggling, hid weapons and ammunition within shipping containers, and then attempted to send the weapons outside the United States for apparent financial gain. In *Vasquez*, the defendant purchased guns from shops in Florida and then packaged six guns and ammunition in a shipping container intended for the Dominican Republic. 745 F. App'x at 323. He admitted to participation in a weapons smuggling ring and he admitted that he had previously smuggled other weapons outside of the United States for financial gain. *Id*. He received a sentence of 46 months' imprisonment, the low end of his guidelines. In *Zamor*, the defendant was convicted after trial in which the evidence showed that he had purchased guns from shops in Florida and attempted to mail 7 disassembled guns, 1 intact gun, and 561 rounds of ammunition to Haiti, where he could profit from the sale of the weapons. 746 F. App'x at 962. He received a sentence of 60 months' imprisonment, when the guideline range was 63 – 78 months. *Id*. at 963.

IV. **The need for the sentence imposed, 18 U.S.C. § 3553(a)(2).**

Lastly, § 3553(a) makes clear that punishment is not the only goal of sentencing as the statute outlines multiple factors for the sentencing courts to consider. Equally important to punishment is the need to consider what type of sentence is most likely to allow Mr. Glover to rehabilitate himself and to contribute to our society. Mr. Glover respectfully submits that the requested sentence will reflect the seriousness of the conduct, punish him, and that continued supervised by the U.S. He has already served nearly 6 months in custody and further supervision by the probation office will serve the purposes of deterrence, protection of the public, and rehabilitation. Mr. Glover has already completed 8 months of supervision by the probation office and he is doing well today.

V. **Conclusion**

For all these reasons, Mr. Glover respectfully submits that a sentence of time served to be followed by 3 years of supervised release with special conditions of 6 months of home detention and drug testing is sufficient but not greater than necessary to meet the goals of sentence enumerated in 18 U.S.C. § 3553(a)(1).

                                      Respectfully submitted,

                                      KEVIN L. BUTLER
                                      Federal Public Defender

                                      /s/ Allison Case
                                      Assistant Federal Public Defender
                                      Office of the Federal Public Defender
                                      505 20th Street, North, Suite 1425
                                      Birmingham, Alabama 35203
                                      (205) 208-7170 Office
                                      Allison_Case@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2019, I filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

                                              Respectfully submitted,

                                              /s/ Allison Case